UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                :
SECURITIES AND EXCHANGE COMMISSION,             :
                                                :
                      Plaintiff,                :
                                                :
                  v.                            :    Civil Action No.
                                                :
MARCO BABINI,                                   :    **JURY TRIAL DEMANDED**
SAMUEL R. BROWN and                             :
EDWARD WITHROW III,                             :
                                                :
                      Defendants.               :
_____:

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges the following against Defendants Marco Babini ("Babini"), Samuel R. Brown ("Brown") and Edward Withrow III ("Withrow"):

## SUMMARY

1.      From approximately July 2012 through March 2013 ("the relevant period"), Babini, Brown and Withrow engaged in a "pump-and-dump" scheme involving the securities, or stock, of Massachusetts-based Endeavor Power Corp. ("Endeavor" or "EDVP").  The purpose of the scheme was to obtain illegal financial benefit for Babini, Brown and Withrow, at the expense of innocent investors, by selling shares of Endeavor's stock to unsuspecting investors at artificially high prices.  The defendants took steps to manipulate, and thereby artificially increase, the share price and trading volume of Endeavor's stock – the pump – and then to sell millions of purportedly unrestricted shares of the company's stock – the dump – into a segment

1

of the public securities markets known as the Over-the-Counter securities market, or the OTC market ("the Endeavor pump-and-dump scheme").

2.      The OTC market, also referred to as the microcap market, is a marketplace for buying and selling shares of stock in companies with more limited assets and lower stock prices than companies listed on the major stock exchanges.  Approximately 10,000 companies have shares that trade on the OTC market's two inter-dealer quotation systems:  the OTC Bulletin Board (OTCBB) and OTC Link (formerly known as "Pink OTC Markets Inc." or "the Pink Sheets").  The OTC market is decentralized, without an actual physical location where stocks can be bought and sold.  Instead, buyers and sellers in the OTC market trade with one another through various modes of communication such as the telephone, email and proprietary electronic trading systems. The OTC market is less transparent than, for instance, stock exchanges, and also subject to fewer regulations.  Between approximately July 2012 and March 2013, Babini, Brown and Withrow used Endeavor as a vehicle for shaping and carrying out a pump-and-dump scheme in the OTC market.

3.      As part of their scheme, Babini, Brown and Withrow took a variety steps designed to acquire and hide their ownership or control over the vast majority of Endeavor's purportedly unrestricted stock, to artificially increase the apparent trading volume of Endeavor's stock, to entice investors to purchase the stock that they secretly controlled by hiring others to promote Endeavor, and ultimately to sell shares they owned or controlled to unsuspecting investors in the public securities markets at the artificially high prices they had created.

4.      In furtherance of the scheme, Withrow also failed to make required filings with the Commission.  Specifically, Commission rules required him to disclose his beneficial

ownership of more than 5% of Endeavor's outstanding stock and to fully disclose his ownership

and control of Endeavor's stock while a member of the company's board of directors.

5.      Ultimately, the Commission thwarted significant aspects of the scheme by

suspending trading in Endeavor's stock after becoming aware of the scheme through an

undercover investigation conducted by the Federal Bureau of Investigation ("FBI").

6.      By knowingly and recklessly engaging in the fraudulent conduct described herein,

Babini, Brown and Withrow violated the antifraud provisions of the federal securities laws,

specifically, Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C.

§ 77q(a)(1) and (3)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act")

[15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c), thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

7.      By engaging in the conduct described herein, Babini violated Section 9(a)(2) of

the Exchange Act [15 U.S.C. § 78i(a)(2)], which makes it unlawful for any person to directly or

indirectly effect a series of transactions in a security that creates actual or apparent trading in the

security, or raises or depresses the price of the security, for the purpose of inducing the purchase

or sale of the security by others.

8.      By engaging in the conduct described herein, Withrow violated Section 13(d) of

the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1(a), thereunder [17 C.F.R. § 240.13d-

1(a)], which together require that any person who directly or indirectly acquires beneficial

ownership of more than 5% of a class of Section 12-registered equity securities must file

Schedule 13D within 10 days of the acquisition, as well as Section 16(a) of the Exchange Act [15

U.S.C. § 78p(a)] and Rule 16a-3, thereunder [17 C.F.R. § 240.16(a)], which together require any

person who acquires more than 10% of a registered class of a company's equity securities, as

well as officers and directors, to file reports of ownership and changes of ownership with the

Commission.

9.      Based on this conduct, the Commission seeks the following relief against Babini, Brown and Withrow:  (i) entry of permanent injunctions prohibiting Babini, Brown and Withrow from engaging in future violations of Section 10(b) of the Exchange Act and Rule 10b-5, thereunder, and Section 17(a) of the Securities Act; (ii) entry of a permanent injunction prohibiting Babini from engaging in future violations of Section 9(a)(2) of the Exchange Act; (iii) entry of a permanent injunction prohibiting Withrow from engaging in future violations of Section 13(d) of the Exchange Act and Rule 13d-1(a), thereunder, and of Section 16(a) of the Exchange Act and Rule 16a-3, thereunder; (iv) an order requiring Babini, Brown and Withrow to disgorge their ill-gotten gains and pay pre-judgment interest; (v) an order requiring Babini, Brown and Withrow to pay appropriate civil monetary penalties; (vi) an order barring Babini, Brown and Withrow from participating in any offering of penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and (vii) an order barring Withrow from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)].

## AUTHORITY AND JURISDICTION

10.     The Commission brings this action pursuant to enforcement authority conferred by Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)].

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§78u(e) and 78aa.  The District of Massachusetts is a proper venue for this action under 28 U.S.C. §1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because, among other things, the defendants undertook acts and transactions constituting violations of the Exchange Act and the Securities Act in the District of Massachusetts.  Also, Endeavor is a Nevada corporation based in Cambridge, Massachusetts.

12.     The defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce, or of the mail, in connection with the acts, practices, and courses of business alleged herein.

13.     The conduct of Babini, Brown and Withrow involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## DEFENDANTS

14.     Marco Babini, age 54, is believed to reside in Vancouver, British Columbia.

15.     Samuel R. Brown, age 34, resides in Bonners Ferry, Idaho.

16.     Edward Withrow III, age 51, resides in Malibu, California.

## THE SCHEME TO MANIPULATE THE PRICE AND TRADING VOLUME OF AND TO PUMP AND DUMP ENDEAVOR STOCK

**A.     The Merger of Endeavor and Parallax Diagnostics, Inc. and the Control of Purportedly Unrestricted Shares of Endeavor Stock by Babini, Brown and Withrow**

17.     Endeavor is a Nevada corporation based in Cambridge, Massachusetts.  In the months prior to November 2012, Endeavor had no real operations or assets, but its stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and was quoted

5

on the OTC trading system under the symbol EDVP.  Although never listed as an officer or director of Endeavor, throughout much of its existence, and specifically during the relevant period, Babini exercised significant control and influence over the company.

18.    Endeavor had changed its purported business model several times prior to the relevant period, from website design/sales to mineral exploration, to the recycling and disposal of computers and other electronic devices.  In the summer of 2012, Brown became aware that Withrow, a business acquaintance of his, was looking for an opportunity to effect a merger between a bio-medical company he owned and controlled, Parallax Diagnostics, Inc. ("Parallax"), and a publicly-traded company.  Among other things, Withrow intended to use the publicly-traded company as a means for raising capital.  Brown understood that Babini controlled and used Endeavor for the type of merger being sought by Withrow and arranged for Babini and Withrow to speak.  Babini and Withrow spoke and quickly consummated a merger agreement.

19.    Endeavor and Parallax merged on or about November 1, 2012, creating a new entity that retained the name Endeavor.  Endeavor filed a Form 8-K with the Commission on November 15, 2012 disclosing the merger and certain of its terms.  Withrow became the Executive Chairman of the new Endeavor's Board of Directors and, as reported in the company's 8-K, as a result of the merger received 7,631,245 shares of Endeavor stock (roughly 5.05% of the company's outstanding common stock).   The stock Withrow received and that was reported in the Form 8-K was restricted, which meant it could not be sold until certain restrictions, or conditions, were met, and then only in compliance with special SEC regulations.

20.    The Form 8-K filed by Endeavor on November 15, 2012 and signed by the company's president and CEO, was materially false and misleading in that it failed to report the

full extent of Withrow's direct and indirect ownership and control of Endeavor's stock. Withrow caused the 8-K to be materially false and misleading by drafting portions of the Form and by failing to provide accurate information about his direct and indirect ownership and control of Endeavor's stock. In addition to the 7,631,245 shares reported in the Form 8-K, Withrow also owned or controlled approximately 48,725,952 additional restricted shares of Endeavor's common stock through his spouse and two businesses. Withrow further controlled approximately 32 million purportedly unrestricted shares of Endeavor stock, which he acquired from Babini. Babini had controlled approximately 40 million purportedly unrestricted shares of Endeavor stock prior to the merger and retained control of approximately six to eight million shares afterward. These approximately 40 million shares constituted the majority of Endeavor's purportedly unrestricted stock and virtually all of the Endeavor stock that had been deposited in brokerage accounts and cleared to trade. In addition to failing to report their interest in these shares, Withrow and Babini further concealed their ownership or control of this stock by utilizing a Swiss trustee to hold the shares through foreign accounts.

B.    **Babini, Brown and Withrow Lay the Groundwork for Their Scheme to Manipulate the Market for and Price of Endeavor's Stock**

21.    Early in the relevant period, even prior to the merger of Endeavor and Parallax, Babini, Brown and Withrow already were planning the pump-and-dump of Endeavor's stock. In October 2012, they spoke with an individual then residing in Massachusetts who Babini understood had facilitated microcap pump-and-dump schemes in the past. Babini, Brown and Withrow believed the individual could help them generate substantial investor interest in Endeavor's stock. Unknown to Babini, Brown and Withrow, the individual ("the CI") was working with agents of the Federal Bureau of Investigation ("FBI") as a confidential informant in an undercover criminal investigation ("the undercover investigation").

22.    At the time, the defendants owned or controlled most, but not all, of the purportedly unrestricted shares of Endeavor stock.  Beginning in the fall of 2012, the defendants undertook efforts to purchase the remaining shares held by public investors and deposited for trading, shares they referred to as "away" from them.  This would enable them to more easily manipulate the price for Endeavor's shares and to sell additional stock at inflated prices during the planned promotions.  In order to pay as little as possible for the Endeavor stock outside of their control, Babini (with Brown's knowledge) acted to drive down Endeavor's stock price.  Babini drove the price down by placing numerous higher-priced sell orders for Endeavor stock, which he did not intend to execute, while simultaneously placing lower-priced buy orders.  This enabled Babini to create the false appearance that a sell-off, or dump, of Endeavor's stock was underway, which positioned him to purchase Endeavor stock at significantly lower prices from unsuspecting investors.  On a December 5, 2012 recorded telephone call with Brown, the CI, and an undercover FBI agent ("the undercover agent"), Babini referred to this activity as a "squeeze," explaining:

> We've really been trying to pinch him [another Endeavor stockholder] and squeeze him so that, you know, effectively he sells down here because obviously it's cheaper for the groups that accumulate the stock down here . . . so it's more of a squeeze that we're trying to do. . . if you look at all the trades [this week], they were all tapped out at 6.5 [cents] and that was us trying to slap them down.

23.    In the same call Brown stated, "[w]hat you see volume-wise now is just us trying to pinch these guys down and get what was away from us.  So that we have, you know, smooth sailing from here forward."  The following week, on another recorded call involving Babini, the CI, and the undercover agent, Babini talked about their continuing efforts to depress the market for Endeavor's stock and make low dollar purchases, stating:

We've been trying to squeeze it out this way for two weeks now.  We've been trying to buy stock under 8 cents all week.  We've been putting bids at 7.  We've been putting bids at 7.5 . . . We've been putting up large offers.

24.     Once all, or virtually all, of Endeavor's stock was in their control, Babini, Brown and Withrow planned to launch a promotional campaign touting the company's stock in order to create the hype – and pump in price – needed to sell their shares to the investing public at artificially inflated prices.  While the defendants planned to use the CI to run the Endeavor promotional campaign, Withrow expressed concern that too much trading in Endeavor's stock could trigger regulatory interest, so he told the CI that the resulting rise in Endeavor's share price had to "look legitimate."  Withrow also promised to send Endeavor's first five press releases to the CI (before they were issued) to assist the CI with the subsequent promotional campaign.  The CI asked if Withrow would be able to handle matters in case the Financial Industry Regulatory Authority, Inc. ("FINRA"), the self-regulatory organization responsible for regulating brokerage firms and exchange markets, inquired about a spike in trading of Endeavor's stock.  Withrow answered that he dealt with FINRA all the time and that he had no problem dealing with FINRA or the SEC.

25.     Withrow also told the CI that he had two goals in pursuing the Endeavor pump-and-dump scheme: (1) to raise approximately $1.5 million by selling shares of Endeavor stock at artificially inflated prices, and (2) to move Endeavor's stock from OTC Link to an exchange like AMEX or NASDAQ SmallCap.  While Withrow indicated that he intended to use at least some of the $1.5 million raised to fund Endeavor's operations, Withrow (like Babini and Brown) also intended to keep some of the proceeds of the pump-and-dump scheme for himself.

26.     Withrow told the CI that a promotional, or touting, campaign for Endeavor stock would be integral to achieving the objectives of the scheme.  Attracting investors and increasing

Endeavor's share price would allow him to take $1.5 million "out of the market" more easily by selling some portion of the 32 million purportedly unrestricted shares under his control. In addition, once Endeavor's share price rose high enough, Withrow planned to do a reverse stock split to bring Endeavor's share price up to about $3.00 per share and place the company in position to be listed on a major exchange, such as AMEX or NASDAQ SmallCap. A reverse stock split is a process by which shares of corporate stock are consolidated to form a smaller number of proportionally more valuable shares.

27.     Withrow also advised the CI that he had a deal with Endeavor's transfer agent to acquire 8,000 shareholders to fulfill another listing requirement for AMEX or NASDAQ SmallCap. A transfer agent is an institution that maintains records tracking the ownership of a company's stocks and bonds. Withrow told the CI that he would pay the transfer agent $75,000 to send and maintain records reflecting an additional 8,000 investors, or owners, of Endeavor stock.

28.     To finance the planned promotion, Babini and Brown, with Withrow's knowledge and agreement, arranged to engage in a series of sham transactions, which they referred to as "crosses," with an individual introduced to them by the CI. The individual claimed to have connections with brokers willing to fraudulently purchase and hold Endeavor stock in their customers' accounts in exchange for monetary kickbacks. The trades referred to by Babini and Brown as "crosses" were matched trades in which Babini and Brown were to enter orders for the sale of Endeavor's stock, on the understanding that a network of corrupt brokers would, in turn, enter orders for the purchase of Endeavor's stock that were of substantially the same size, at substantially the same time, and at substantially the same price; in effect, "matching" the trades by Babini and Brown.

29.     Unbeknownst to the defendants, this supposedly well-connected individual was actually an undercover FBI agent, and the conversations were recorded.  The following exchanges took place during a December 5, 2012 call involving Babini, Brown, the CI, and the undercover agent in which they discussed plans for executing matched trades for a fee payable to the undercover agent and his supposed network of brokers:

> **Undercover Agent:**  The bottom line is I have a network of brokers.  They're willing to accumulate stock.  These are discretionary accounts, not a problem. We could, we could, you know, put some stock away.  Um, I just need to know how much buying you would want put into this thing and over what period of time.

> **Babini:** . . . We were looking to build up a war chest so that we can go out to some of the various [promotional e-mail] lists that both Sam [Brown] and, and [the CI] have, and try to do a PR and see if we can't move this to higher ground.

> **Undercover Agent:** … So you are looking to get this to, you want to ultimately get out at a buck, is that your game plan here?

> **Babini:** Well, I mean, I think, I think if you look at the story, if any of the, if any of the proposals come together or the acquisitions, I think we could get at least to 50 cents.

> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

> **Undercover Agent:**  So, fee-wise, we're talking 20 points.  How does that sound?

> **Babini:** Seems a little high, but, you know.

> **Brown:** Yeah.

> **Babini:**  Is that on, on what we can actually sell, or 20 points on what you buy?

> **Undercover Agent:**  Uh, well, that would be the same thing right?  We're gonna, we're gonna cross it, and right?  I mean, if I go in and buy $20,000 worth of stock, I'm going to be buying your stock.

> **Brown:**  Yeah, if it was crossed out, yeah…okay.

> **CI:**  That'd just be on the capture, that wouldn't be on the general market.

> **Undercover Agent:** Yeah, but . . . we would need to make sure that we, you know, capture everything from you, and, I mean, we should be able to do that, right?

**Babini:** I would think so, yep.

**Brown:** Yep, yep.

**Undercover Agent:** . . . We would have to closely, closely coordinate this thing . . . I'll call you up and say, all right, what do you, how many, how many shares do you want me to buy and at what price? And I'll give you five minutes to make sure you're good on your end, and then, we'll, we'll do it. And it should happen, and we shouldn't have any capture issue I would, I would think.

**Babini:** Right.

**Brown:** Okay. That seems easy enough to do.

30. On a subsequent recorded call on December 10, 2012, Babini, Brown, the CI, and the undercover agent discussed structuring a matched trade in which Babini would sell 250,000 shares of Endeavor stock to the undercover agent who, in exchange, would pay $20,000 to Babini. Babini, in turn, agreed to pay a kickback to the undercover agent for engaging in the matched trade. Babini entered an order to sell 250,000 shares of Endeavor stock at $.08 per share shortly after this call, and the undercover agent entered an order to buy 250,000 shares of Endeavor stock for approximately $.08 per share. However, the attempted matched trade was not executed because the undercover agent's order appears to have been partially filled by another party, causing Babini to cancel his order. With this failure, the plan to use a network of brokers to facilitate matched trades fizzled and, with it too, that source of potential financing for the pump of Endeavor's stock. The failed matched trade also marked the end of the CI's planned participation in the pump-and-dump scheme. Babini, Brown and Withrow decided to drop him from their plans, although Babini continued to have conversations with the CI about the scheme.

31. Without financing from the undercover agent's supposed network of brokers, Babini and Brown sought an alternative way to pay for a promotion of Endeavor's stock. One route was to sell some of the Endeavor stock they controlled. Accordingly, on December 28,

2012, an account controlled by Babini in the name of Bank Gutenberg AG (Switzerland) sold 400,000 shares of Endeavor stock for net proceeds of $23,959.46.  The trade settled on January 3, 2013, which means the transaction was completed, and Bank Gutenberg AG received the proceeds of the sale on that date.  The next day, on January 4, 2013, an account held at VP Bank (Schweiz) AG (Switzerland) in the name of Norboten Investment LTD transferred $22,975 to Emerge Capital Group LLC ("Emerge Capital"), a company controlled by Brown.   Babini was the source of the $22,975.  Babini sent Brown the money so that he (Brown) could pay a known microcap promoter to market Endeavor's stock.

32.    On January 7, 2013, Emerge Capital paid $19,975 ($20,000 minus a $25 wire transfer fee) to Bull in Advantage, LLC, ("Bull in Advantage") a microcap stock promotion company.  The source of the $20,000 used for the promotion was the $22,975 that Brown received from Babini three days earlier.

### 1.    The First Promotion of Endeavor's Stock (January 8-9, 2013)

33.    On January 8, 2013, Babini, Brown and Withrow unleashed a promotional campaign for Endeavor stock.   On that date a stock promotion firm named Wall Street Stallions listed Endeavor as its "New Monster Pick!"   On the same day, Endeavor issued a press release stating that the Endeavor Chairman would participate in an interview on StockTradersTalk Radio that night to discuss the company's recent announcements.   Wall Street Stallions disclosed that it had received a payment of $10,000 for its promotional work, and although it did not identify the source of the funds, bank records indicate a contemporaneous $10,000 debit to Bull in Advantage's account, the firm hired by Brown for promotional work.

34.    On January 9, 2013, a number of other websites also touted Endeavor's stock with a series of promotional alerts, sent via interstate wire to recipients in Massachusetts and

elsewhere.  The promotional alerts notified website subscribers of Endeavor's supposed

transition into the medical device field.  The alerts were issued on the same day as a press release

published by Endeavor titled "Endeavor Power Corporation Outlines Its New Target Market, Its

Size and Projected Growth."   Three of these websites disclosed that they received compensation

of $7,500 from Bull in Advantage relating to the promotion of Endeavor.

  35.  Bull in Advantage and another website called Stock Sumo that Brown understood

to be controlled by the owner of Bull in Advantage also issued promotional alerts touting

Endeavor on January 9, 2013.  Stock Sumo and Bull in Advantage disclosed in their promotional

materials that they received $2,500 "from a Third-Party for a one-week market awareness

program on behalf of EDVP."  This disclosure was misleading in that neither Babini nor Brown

– who had supplied the money and who were major shareholders of Endeavor, or EDVP, who

stood to benefit from the promotion – were a "Third-Party."

  36.  There were no purchases or sales of Endeavor's stock on January 2, 3, and 4,

2013, and only 1,000 shares traded on January 7, 2013.  On each of those days the stock closed

at $.05 per share.  Average daily trading volume from November 15, 2012 through January 7,

2013 had been approximately 53,000 shares.  On January 8 and 9, 2013, after the internet

promotions and related Endeavor press releases, the trading volume in Endeavor's stock was

352,400 and 713,800 shares, respectively, and the stock closed at $.08 per share each day.

Babini sold approximately 139,925 shares of Endeavor stock on January 8 and 9, for proceeds of

approximately $10,019, and Brown sold approximately 130,000 shares for proceeds of

approximately $8,127.  Despite these proceeds, Babini expressed dissatisfaction with the results

of the promotional campaign during a recorded call with the CI on January 14, 2013.

##### 2. Babini and Brown Push the Price of Endeavor Stock Higher With a Series of Coordinated Purchases in February 2013

37.     Throughout February 2013, Babini and Brown made a series of coordinated purchases of Endeavor stock designed to push the price of the stock higher, a process sometimes referred to as "walking up" the stock.  Their efforts also served to reduce the number of shares of Endeavor stock outside of their control.  Endeavor's share price rose from $.07 per share to $.25 per share between February 15, 2013 and February 25, 2013.  On February 15, 2013, the stock closed at $.07 per share; on February 19, 2013, the price rose to $.10 per share; on February 21, 2013, it rose further to $.12 per share; and on February 22, 2013, it shot up to $.25 per share. Babini's and Brown's trading records reflect a series of  orders placed by them to purchase shares of Endeavor stock at higher and higher prices during this period.

38.     These purchases, designed to walk up the price of Endeavor stock to approximately $0.25 per share, were consistent with a strategy communicated by Babini, Brown, and Withrow to the CI in October 2012, prior to the merger between Endeavor and Parallax. During an October 5, 2012 call between Babini and the CI, which was surreptitiously recorded as part of the FBI's undercover investigation, Babini stated: "I think they want to start around a quarter."  Then, in a telephone conversation between Brown and the CI on October 12, 2012, Brown stated: "[b]ecause there's not that much [Endeavor stock] out there [outside of our control], we'll clean it up and probably start it around a quarter."   And later, on an October 19, 2012 call between Withrow and the CI, the CI asked:  "What price do you think that we're going to start with?"  Withrow responded:  "20 . . . I don't want to go under 20."

39.     In addition, on February 15, 2013, Babini introduced Withrow to a different stock promoter during a telephone conversation.  The stock promoter said that he would promote Endeavor's stock in exchange for a portion of the proceeds from the shares sold by Babini,

Brown and Withrow as a result of the promotion.  Withrow told Babini and others that he did not want the promotional campaign to begin until Endeavor's stock was trading at approximately $0.25 per share.  Babini assured Withrow that he had people who would purchase Endeavor stock in order to raise the share price to that level.

40.    After the price of Endeavor stock hit $0.25 per share on February 22, 2013, in a telephone conversation between Babini and the CI that was surreptitiously recorded as part of the FBI's undercover investigation, Babini discussed his and Brown's purchases of Endeavor stock, and their intent to cause the price to increase, or walk it up.   Babini told the CI, "we're just tightening it up a bit . . . just internal buying, like uh, there's been a little bit of conversation about a certain cross that was done, so we're just trying to buy it back, and then, you know, so, so we're getting uphill."  Endeavor's stock closed at $.25 per share on February 22, 2013, and the share price remained relatively high (fluctuating between about $.17 and $.28 per share) until a second promotion of the stock began on March 7, 2013, when the stock opened at $.22 per share.

### 3.  The Second Promotion of Endeavor's Stock (March 7-8, 2013)

41.    On March 6, 2013, after the securities markets had closed, Withrow kicked off the second promotional campaign by causing Endeavor to issue a press release titled, "Endeavor Power Corp. Announces New CEO & Targets $14 Billion Point of Care Testing Market."  On March 7, 2013, Stock Sumo and Bull in Advantage issued promotional alerts concerning Endeavor, which stated that "[o]wners of this newsletter received $2,500 from a Third-Party for a One Day Awareness Program on EDVP, which has since expired (01/13/13)."  That disclosure was misleading since the promotion was not funded by a "Third-Party," but rather by Babini and

Brown, major shareholders of Endeavor who along with Withrow, Endeavor's Chairman, stood to benefit from any increase in share price.

42.     Various other websites also sent blast e-mails promoting Endeavor on March 7, 2013, and these e-mails were sent via interstate wire to recipients in Massachusetts and elsewhere.   The promotional materials were issued as part of the coordinated plan formulated by Babini, Brown and Withrow.   Those alerts also were misleading in that they projected that Endeavor's stock price would continue climbing based on the rise in Endeavor's share price in late February 2013, implying that legitimate demand for Endeavor's stock was responsible for that price increase.  In fact, a substantial portion of the late February 2013 purchases of Endeavor were made and coordinated by Babini and Brown in an effort to reduce the number of shares outside of their control and walk up the share price prior to the promotion they were planning for early March 2013.

43.     Trading in Endeavor stock on March 7, 2013, after the promotional campaign began, appeared to exceed 1.4 million shares.  However, during a telephone conversation on March 8, 2013 that was surreptitiously recorded as part of the FBI's undercover investigation, Babini told the CI that much of the March 7, 2013 trading in Endeavor stock was "just optics." When the CI pressed Babini for more of an explanation, Babini responded that a lot of the trading volume was due to "double prints."   A "double print" refers to the practice of structuring a trade so that that multiple trades are reported to the securities market for what is effectively a single trade, with the result being that the volume of trading reported to the market is artificially inflated.

44.     Babini accomplished the "double print" trading effect with Endeavor stock by colluding with a broker to have the broker place orders to sell short early in the day.   Then, later

in the day, trades placed by Babini with the broker, at a predetermined price, would be used for the broker to acquire the shares needed to cover his short position. Both the short sales and the subsequent purchases were improperly reported as separate trades, when, in fact, it was a single trade. On March 7, 2013, at approximately 9:15 a.m., Babini arranged to have a sell order placed with the broker for 450,000 shares of Endeavor stock. The broker then executed a series of trades to sell short a total of approximately 446,721 shares of Endeavor between 9:35 a.m. and 12:14 p.m. At 12:14 p.m., immediately after placing the final short sale order, the broker purchased 450,000 shares of Endeavor pursuant to the sell order that Babini had directed to the broker about three hours earlier. Babini used the same Bank Gutenberg AG account that had been involved in funding the Endeavor promotional campaigns to place the trades with the broker. The "double print" created a misleading picture of the trading volume in Endeavor stock. Without the "double print" trading, the reported volume of Endeavor shares traded on March 7, 2013 would have been reduced by about one third, so that the reported number of Endeavor shares traded would have been reduced from 1,486,500 to roughly one million.

45. On March 8, 2013, before the securities markets opened, additional blasts of promotional e-mails were sent touting Endeavor's stock. The promotional materials were issued as part of the coordinated plan formulated by Babini, Brown and Withrow to hide their ownership or control over the vast majority of Endeavor's purportedly unrestricted stock, artificially increase the apparent trading volume of Endeavor's stock, entice investors to purchase the stock that they secretly controlled by hiring others to promote Endeavor, and ultimately sell shares they owned or controlled to unsuspecting investors in the public securities markets at the artificially high prices they had created.

46.     These promotional emails were misleading in that they continued to project that Endeavor's stock would climb based on the rise in Endeavor's share price in late February 2013.  They were also misleading to the extent that they pointed to the volume of shares traded on March 7, 2013 as an indication of investor interest in Endeavor's stock because a substantial amount of this volume was artificially inflated through trading by Babini that he called "double prints."  In addition, the promotional emails were misleading in that they failed to disclose the ownership or control of Endeavor stock by Babini, Brown and Withrow, who were responsible for the promotional campaign.

47.     On March 8, 2013, the Commission issued an order pursuant to Section 12(k) of the Exchange Act suspending trading in the securities of Endeavor as a result of the spike in trading and questions concerning the accuracy of statements made in Endeavor's public filings. The order suspending trading effectively ended any further attempts by Babini, Brown and Withrow to profit from the pump-and-dump scheme involving Endeavor stock.

**C.     Withrow Fails to File Required Disclosure of His Beneficial Ownership of Endeavor Stock**

48.     From at least November 2012 through at least March 8, 2013, Withrow was the beneficial owner of approximately 32 million purportedly unrestricted shares of Endeavor stock, which he acquired from Babini as a result of the Endeavor/Parallax merger.  These shares accounted for approximately 22% of the issued and outstanding shares of Endeavor's common stock during the relevant period.   Having directly or indirectly acquired beneficial ownership of more than 5% of the outstanding Endeavor stock, an equity security of a class which is registered with the Commission pursuant to Section 12 of the Exchange Act, Withrow failed to file information necessary and appropriate in the public interest and for the protection of investors, via Schedule 13D, with the Commission as required.

49.     From at least November 2012 through at least March 8, 2013, Withrow was a director of Endeavor and a beneficial owner of more than 10% of a registered class of Endeavor's equity securities, and Withrow failed to file reports of ownership and changes of ownership with the Commission as required.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5(a) and (c), thereunder

(As to Defendants Babini, Brown and Withrow)

50.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 49 above as if set forth fully herein.

51.     From at least July 2012 through at least March 8, 2013, Defendants Marco Babini, Samuel R. Brown and Edward Withrow III, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly, willfully and recklessly a) employed devices, schemes and artifices to defraud, and b) engaged in acts, practices, and courses of business which operated and which would operate as a fraud or deceit upon certain persons.

52.     By reason of the foregoing, Defendants Babini, Brown and Withrow, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c), thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a)(1) and (3) of the Securities Act

(As to Defendants Babini, Brown and Withrow)

53.     The Commission repeats and incorporates by reference the allegations in

paragraphs 1 through 49 above as if set forth fully herein.

54.     From at least July 2012 through at least March 8, 2013, Defendants Marco Babini,

Samuel R. Brown and Edward Withrow III, directly or indirectly, acting intentionally, knowingly

or recklessly, by use of the means or instruments of transportation or communication in interstate

commerce or by the use of the mails, in the offer or sale of securities a) employed devices,

schemes and artifices to defraud, and b) engaged in acts, practices, and courses of business which

operated and which would operate as a fraud or deceit upon certain persons.

55.     By engaging in the conduct described above, Defendants Babini, Brown and

Withrow, singly or in concert, directly or indirectly, have violated, and unless enjoined will

continue to violate, Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and

(3)].

### THIRD CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 10(b) of the Exchange Act
and Rule10b-5(a) and (c), thereunder**

(As to Defendants Brown and Withrow)

56.     The Commission repeats and incorporates by reference the allegations in

paragraphs 1 through 49 above as if set forth fully herein.

57.     From at least July 2012 through at least March 8, 2013, in connection with the

Endeavor pump-and-dump scheme, Defendant Marco Babini, directly or indirectly, by use of the

means or instrumentalities of interstate commerce, or of the mails, in connection with the

purchase or sale of securities, knowingly, willfully and recklessly a) employed devices, schemes

and artifices to defraud, and b) engaged in acts, practices, and courses of business which

operated and which would operate as a fraud or deceit upon certain persons.

58.     Brown aided and abetted the violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c), thereunder by Babini, by knowingly and substantially assisting Babini with the Endeavor pump-and-dump scheme with at least a general awareness that his conduct was part of an overall activity that was improper.

59.     Withrow aided and abetted the violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c), thereunder by Babini, by knowingly and substantially assisting Babini with the Endeavor pump-and-dump scheme with at least a general awareness that his conduct was part of an overall activity that was improper.

60.     By reason of the foregoing, Defendants Brown and Withrow aided and abetted Babini's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c), thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## FOURTH CLAIM FOR RELIEF

### Violation of Section 9(a)(2) of the Exchange Act

(As to Defendant Babini)

61.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 49 above as if set forth fully herein.

62.     From at least November 2012 through at least March 8, 2013, Defendant Marco Babini, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange, or for any member of a national securities exchange, effected, alone or with one or more other persons, a series of transactions in any security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

63.     Babini thereby violated Section 9(a)(2) of the Exchange Act [15 U.S.C. §
78i(a)(2)].

## FIFTH CLAIM FOR RELIEF

### Violation of Section 13(d) of the Exchange Act
### and Rule 13d-1, thereunder

(As to Defendant Withrow)

64.     The Commission repeats and incorporates by reference the allegations in
paragraphs 1 through 49 above as if set forth fully herein.

65.     From at least November 2012 through at least March 8, 2013, Defendant Edward
Withrow III violated Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1(a),
thereunder [17 C.F.R. § 240.13d-1(a)] in that having directly or indirectly acquired beneficial
ownership of more than 5% of Endeavor's outstanding common stock, an equity security of a
class which is registered pursuant to Section 12 of the Exchange Act, Withrow failed to file a
statement containing the information necessary and appropriate in the public interest and for the
protection of investors, via Schedule 13D, with the Commission as required.

## SIXTH CLAIM FOR RELIEF

### Violation of Section 16(a) of the Exchange Act
### and Rule 16a-3, thereunder

(As to Defendant Withrow)

66.     The Commission repeats and incorporates by reference the allegations in
paragraphs 1 through 49 above as if set forth fully herein.

67.     From at least November 2012 through at least March 8, 2013, Defendant Edward
Withrow III violated Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)], and Rule 16a-3,
thereunder [17 C.F.R. § 240.16a-3(a)], in that as a director of Endeavor and having acquired more

than 10% of a registered class of Endeavor's equity securities, Withrow failed to file reports of ownership and changes of ownership with the Commission as required.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests a Final Judgment that:

### **I.**

Permanently enjoins Defendants Marco Babini, Samuel R. Brown and Edward Withrow III, their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5, thereunder [17 C.F.R. § 240.10b-5].

### **II.**

Permanently enjoins Defendants Marco Babini, Samuel R. Brown and Edward Withrow III, their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### **III.**

Permanently enjoins Defendant Marco Babini, his agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 9(a)(2) of the Exchange Act [15 U.S.C. § 77i(a)(2)].

### **IV.**

Permanently enjoins Defendant Edward Withrow III, his agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice

of the injunction by personal service or otherwise, and each of them, from future violations of Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1(a), thereunder [17 C.F.R. § 240.13d-1(a)].

## V.

Permanently enjoins Defendant Edward Withrow III, his agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3, thereunder [17 C.F.R. § 240.16(a)].

## VI.

Orders Defendants Marco Babini, Samuel R. Brown and Edward Withrow III, to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

## VII.

Orders and requires Defendants Marco Babini, Samuel R. Brown and Edward Withrow III to disgorge their ill-gotten gains and losses avoided, plus pre-judgment interest.

## VIII.

Issues an Order barring Defendants Marco Babini, Samuel R. Brown and Edward Withrow III, from participating in any offering of penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

## IX.

Issues an Order barring Defendant Edward Withrow III, from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act

[15 U.S.C. § 78l], or that is required to file reports pursuant to Section 15(d) of the Exchange Act

[15 U.S.C. § 78o(d)], pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)],

and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)].

## X.

Retains jurisdiction over this action to implement and carry out the terms of all orders and

decrees that may be entered.

## XI.

Grants such other and further relief as the Court may deem just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Dated:   Boston, Massachusetts
         September 14, 2015

On behalf of the Commission,


        //s// Martin F. Healey
Martin F. Healey (MA BBO No. 227550)
Andrew Palid (MA BBO No. 664968)
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch Street, 23rd Floor
Boston, Massachusetts  02110
(617) 573-8952 (Healey)
HealeyM@sec.gov
PalidA@sec.gov